UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

AMICHAI OHRING,

            Plaintiff,

   v.

UNISEA, INC.; and Does 1 through
100, inclusive,

            Defendants.

C21-359 TSZ

ORDER

THIS MATTER comes before the Court on a Motion to Compel Arbitration, docket no. 18, filed by Defendant UniSea, Inc. ("Unisea"). Having reviewed all papers filed in support of, and in opposition to, the motion, the Court enters the following order.

**Background**

Unisea, a subsidiary of a multibillion-dollar Japanese company, engages in the business of processing crab, pollock, and Pacific cod in Dutch Harbor, Alaska. Compl. (docket no. 1 at ¶ 22); Plaisance Decl. (docket no. 19 at ¶ 2). Unisea's seafood processing operations are seasonal because they depend on the timing and quantity of the fishing seasons for the various species. Plaisance Decl. at ¶ 3. Due to the seasonal nature of the work, Unisea hires seafood processing employees pursuant to six-month

employment agreements ("Employment Agreements"). Id. Unisea's Employment

Agreements contain an arbitration provision that incorporates its Employee Dispute

Resolution Agreement ("DRA"). Id. at ¶ 4. Unisea requires seafood processing

employees to sign both agreements. Id.

Plaintiff Amichai Ohring submitted an online application to work as a seafood

processor for Unisea on August 4, 2020. Ohring Decl. (docket no. 29 at ¶ 2). That same

day, Unisea sent him an email containing a description of the position. Ex. 1 to Ohring

Decl. (docket no. 29-1 at 2–3). The email informed Ohring that he would be responsible

for his transportation home if he did not complete his contract and warned that tickets out

of Dutch Harbor were over $1,000. Id. at 3. The email did not mention arbitration or the

DRA. See id.

In a subsequent email also sent on August 4, 2020, Unisea asked Ohring to call

one of its employees for a telephone interview. Id. at 2. During the interview, the Unisea

employee informed Ohring that if he was hired, he would need to undergo a 14-day

quarantine in Dutch Harbor prior to beginning the job. Ohring Decl. at ¶ 4. Unisea's

employee again did not mention arbitration or the DRA during the interview. Id.

On August 7, 2020, Unisea sent Ohring an email offering him the position. Ex. 2

to Ohring Decl. (docket no. 29-2 at 4–5). In the email, Unisea asked if Ohring could fly

to Dutch Harbor on specific dates and offered to help him arrange his flight to

Anchorage, Alaska. Id. The email also said that "[d]epending on flight prices and

availability, [booking Ohring's flights] may result in a payroll deduction." Id. Ohring

understood this to mean that traveling to Dutch Harbor constituted his acceptance of an

employment offer.  Ohring Decl. at ¶ 5.  Unisea provided Ohring with a letter stating that he was an essential employee so that he could gain entry to Alaska during the COVID-19 pandemic.  Ex. 3 to Ohring Decl. (docket no. 29-3).

   After Ohring arrived in Dutch Harbor and completed his 14-day quarantine, for which Unisea compensated him, Unisea took him to its complex where he was drug tested.  Ohring Decl. at ¶¶ 8–9.  Unisea then conducted a housing orientation and gave Ohring his room assignment.  Id. at ¶ 9.  Afterwards, Unisea told Ohring to go to the main office the following morning to complete his paperwork.  Id.

   Ohring arrived at the main office the next morning, August 31, 2020, with approximately 15 other Unisea employees, many of whom did not speak English.  Id. at ¶ 10; Ex. 2 to Plaisance Decl. (docket no. 19 at 10–11).  The receptionist gave Ohring a small stack of papers to sign.  Ohring Decl. at ¶ 10.  The first form was the Employment Agreement.  Ex. 2 to Plaisance Decl. at 10–11.  The agreement contained the following arbitration clause:

> **AGREEMENT TO ARBITRATE:** The Company and the Employee recognize and agree that resolving disputes outside of court has distinct advantages for both parties, such as reduced costs, quicker decisions, experienced decision-making, and fair processes.  The Company and Employee thus agree to resolve all Covered Disputes in the manner set forth in UniSea's Dispute Resolution Agreement, the terms and definitions of which are incorporated herein.

Id. at 11.  The second form was an Acknowledgment of Receipt and Understanding of the Employee Handbook ("Acknowledgment of Receipt").  Ex. 3 to Plaisance Decl. (docket no. 19 at 13).  The Employee Handbook contains an arbitration section that discusses the DRA:

1          ***ARBITRATION***

2          UniSea has entered a Dispute Resolution Agreement with all employees
           hired or rehired on or after January 1, 2002. In that Agreement, UniSea and
3          the employee bilaterally agree to arbitrate all Covered Disputes, as defined
           in the Dispute Resolution Agreement. In summary, the Agreement states that
4          both the company and the employee recognize and agree that resolving
           disputes outside the court has distinct advantages for both parties. These
5          include reduced costs, quicker decisions, and experienced decision-making
           and fair processes. The Agreement does not alter the At-Will employment
6          relationship of the parties. For more information, please review the terms of
           the Agreement and contact the Human Resources Department with any
7          questions or concerns.

8    Ex. 4 to Plaisance Decl. (docket no. 19 at 26).

9          The third document Ohring signed was the DRA. DRA, Ex. 6 to Plaisance Decl.

10   (docket no. 19 at 78–80). By signing the DRA, employees agree to have all Covered

11   Disputes resolved according to the process the DRA outlines. Id. at 78. The DRA

12   defines Covered Disputes to "include all disputes between Employer and Employee

13   which are cognizable in a court of law involving alleged violations of federal, state or

14   local laws . . . which apply to their employment relationship . . . including . . .

15   compensation, including the payment of wages, bonuses, or commissions." Id. The

16   DRA also requires employees to engage in a multistep, pre-arbitration process in which

17   they first discuss the matter with their immediate supervisor, department manager, human

18   resources representative, or company executive. Id. If that discussion does not resolve

19   the dispute, employees must discuss the dispute with the corporate human resources

20   manager or their designee. Id. "Any Covered Dispute that has not been resolved at Steps

21   1 or 2 must be resolved by binding arbitration," and an employee must attempt to resolve

22   the dispute through Steps 1 and 2 before moving to arbitration. Id. The DRA, however,

23

does not require Unisea to follow these steps when Unisea brings a dispute against an employee; and the DRA does not provide for tolling of the applicable statute of limitations during an employee's pursuit of the first two steps. See id.

Additionally, the DRA incorporates the Federal Arbitration Act ("FAA") and provides that "[q]uestions about whether a dispute must be arbitrated under this Agreement shall be determined by the arbitrator." Id. at 78–80. The DRA also provides: (1) that the employee serve a demand for arbitration within 12 months of the date on which the employee knew or should have known of the incident giving rise to the dispute; (2) that the employee pay any incurred attorney's fees and costs, unless otherwise ordered by the arbitrator; (3) that "[a]ll matters submitted to arbitration, as well as the decision of the arbitrator, testimony, discovery, facts and matters presented in arbitration, shall be confidential and shall not be disclosed by any party or participant in the arbitration, except as is necessary for the enforcement or appeal of the decision"; and (4) that Unisea may unilaterally terminate the DRA by giving employees 60 days' notice. Id. at 78–80. The DRA also contains a severance clause. Id. at 80.

When Ohring was at the main office to sign paperwork, the receptionist was the only Unisea employee present. Ohring Decl. at ¶ 10. Ohring stated that "it was clear to [him] that English was not [the receptionist's] first language and that she would be unable to explain the arbitration agreement or its terms." Id. Ohring understood that if he did not sign the paperwork, Unisea would fire him and he would have to pay for his own lodging, food, and transportation home. Id. at ¶ 11. Ohring estimated that these costs would amount to around $2,000, which he could not afford. Id. Moreover, due to the

seasonal nature of the work, Ohring did not believe he would be able to find another seafood processing job, as the fishing season had already commenced.  Id. at ¶ 12.  For these reasons, Ohring felt "[t]here was no way [he] could refuse to sign."  Id. at ¶ 13.

On December 28, 2020, Ohring's signed another six-month Employment Agreement with Unisea that was identical to the one he signed in August.  Ex. 5 to Plaisance Decl. (docket no. 19 at 75–76).  Ohring did not sign another Acknowledgment of Receipt or DRA.  See Plaisance Decl.

Ohring filed a class action complaint against Unisea on March 16, 2021.  Compl. (docket no. 1).  In the Complaint, Ohring alleged that Unisea violated the Fair Labor Standards Act ("FLSA") and the Alaska Wage and Hour Act by not paying its employees for the time it takes them to put on and remove protective gear.  Compl. at 9–10.

On April 8, 2021, Unisea emailed its employees to notify them of changes it had made to the DRA.  Ex. 7 to Plaisance Decl. (docket no. 19 at 82).  Specifically, Unisea explained that it would no longer enforce: (1) the 12-month limitations period, (2) the confidentiality requirement, and (3) the cost-sharing provision if it "would effectively prevent [employees] from arbitrating [their] claims."  Id.  The email further stated that the changes would be effective starting that day.  Id.  On April 27, 2020, Unisea sent out an additional email informing employees that they no longer had to first report concerns to their supervisor, manager, human resources, or company executives before initiating arbitration and that they may instead "simply go straight to arbitration."  Ex. 8 to Plaisance Decl. (docket no. 19 at 84).

Two days later, on April 29, 2021, Unisea filed its Motion to Compel Arbitration. Ohring opposes the motion, asserting that the arbitration provisions in the employment agreement and DRA are procedurally and substantively unconscionable.

**Discussion**

### 1.    Delegation of Arbitrability

Unisea argues that because, through the DRA, the parties expressly delegated arbitrability issues to the arbitrator, and not the Court, the arbitrator must decide whether the arbitration provisions in the DRA and other agreements are valid.

The parties agree that the FAA applies. See Mot. to Compel Arbitration (docket no. 18 at 5); Response (docket no. 28 at 18). Under the FAA, courts generally "must determine two 'gateway' issues: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." Brennan v. Opus Bank, 796 F.3d 1125, 1130 (9th Cir. 2015). Parties, however, may delegate these gateway issues to an arbitrator if they clearly and unmistakably provide for it. Id. "Clear and unmistakable evidence of an agreement to arbitrate arbitrability 'might include . . . a course of conduct demonstrating assent . . . or . . . an express agreement to do so." Mohamed v. Uber Tech., Inc., 848 F.3d 1201, 1208 (9th Cir. 2016) (quoting Momot v. Mastro, 652 F.3d 982, 988 (9th Cir. 2011)). The Ninth Circuit has "held that language 'delegating to arbitrators the authority to determine the validity or application of any of the provisions of the arbitration clause constitutes an agreement to arbitrate threshold issues concerning the arbitration agreement.'" Mohamed, 848 F.3d at 1208 (quoting Momot, 652 F.3d at 988).

Unisea contends that the language in the DRA providing that "[q]uestions about whether a dispute must be arbitrated under this Agreement shall be determined by the arbitrator" clearly und unmistakably delegates threshold arbitrability questions to an arbitrator. Ohring does not dispute this contention. Indeed, the Ninth Circuit has held that comparable language constituted clear and unmistakable evidence that the parties delegated threshold arbitrability questions to an arbitrator. See Mohamed, 848 F.3d at 1209; Momot, 652 F.3d at 988. In Mohamed, the Ninth Circuit determined the parties had clearly and unmistakably agreed to arbitrate arbitrability where their agreements "delegated to the arbitrators the authority to decide issues relating to the 'enforceability, revocability or validity of the Arbitration Provision or any portion of the Arbitration Provision.'" Mohamed, 848 F.3d at 1209. Comparably, the language in the DRA's delegation clause clearly states that an arbitrator shall decide disputes regarding arbitrability.

## 2. Unconscionability of the Delegation Clause

Although the DRA delegated issues of arbitrability to the arbitrator, this does not end the Court's inquiry because Ohring also asserts that the DRA's delegation clause is procedurally and substantively unconscionable. "Because a court must enforce an agreement that . . . clearly and unmistakably delegates arbitrability questions to the arbitrator, the only remaining question is whether the particular agreement *to delegate* arbitrability . . . is itself unconscionable." See Brennan, 796 F.3d at 1132.

Under Washington law,[1] a contract can either be procedurally or substantively unconscionable. Burnett v. Pagliacci Pizza, Inc., 196 Wn.2d 38, 54, 470 P.3d 486 (2020). A contract is procedurally unconscionable when there is impropriety in the formation of the contract. Id. On the other hand, a contract is substantively unconscionable when its terms are "one-sided or overly harsh." Id. Either type of unconscionability is sufficient to render an agreement void. Id.

Ohring argues that the delegation clause is procedurally unconscionable because he did not have a meaningful choice in agreeing to it. "A contract is 'procedurally unconscionable' when a party with unequal bargaining power lacks a meaningful opportunity to bargain." Id. To determine whether a party lacked a meaningful choice, courts examine the circumstances surrounding the contract formation, including (1) the manner in which the contract was entered, (2) whether the party had a reasonable opportunity to understand the terms of the contract, and (3) whether the important terms were "hidden in a maze of fine print." Id.

Ohring asserts that the delegation clause, which was included in the DRA, was part of an adhesion contract. Unisea does not dispute this, but asserts that an adhesion contract does not alone make the delegation clause procedurally unconscionable. There is no doubt that Ohring, a short-term employee, did not have equal bargaining power with his employer, the subsidiary of a multibillion-dollar company. Unisea is correct,

---

[1] The parties agree that Washington law applies. Response at 6–7; Reply (docket no. 30 at 10).

however, that the contract being an adhesion contract is relevant but not determinative. See id. "The key inquiry here is whether a party lacked meaningful choice." Id. at 55.

The undisputed facts surrounding Ohring's signing of the delegation clause demonstrate that he lacked a meaningful choice. Ohring did not know of the delegation clause until after he had already accepted the seafood processor position, travelled to Dutch Harbor, quarantined for two weeks, been drug tested, attended a housing orientation, and received his room assignment. When Unisea provided Ohring with the contract containing the delegation clause, Unisea simply handed him and several other new employees the paperwork to sign. There was no Unisea employee at the main office who could explain to Ohring, or to the other new employees (many of whom did not speak English), the delegation clause, how long an employee had to sign, or what would happen if an employee refused to sign. Instead, Unisea apparently expected Ohring and the other employees to sign the agreement containing the delegation clause right then and there. Accordingly, Ohring did not have a reasonable opportunity to understand the delegation clause prior to signing it.

Furthermore, under Washington law, "[a] choice compelled by the threat of immediate termination is not a meaningful choice." Mayne v. Monaco Enter., Inc., 191 Wn. App. 113, 123, 361 P.3d 264 (2015). When Ohring was presented with the delegation clause, he understood that if he did not assent to it, Unisea would not employ him, a fact which Unisea acknowledges. See Reply at 4–5; Plaisance Decl. (docket no 19 at ¶ 4). To make matters worse, Ohring believed that if he did not sign the DRA, he would have to pay for his own lodging, food, and transportation home. Ohring also

feared that, as it was August and the fishing season had already started, he would not be able to find another seafood processing job.

Unisea argues that it would have paid for Ohring's transportation home if he had refused to sign the agreement containing the delegation clause, but Ohring's assumption that he would be financially responsible for transportation was reasonable, as both the offer letter and Employment Agreements stated that he was responsible for the costs of his transportation out of Dutch Harbor if he quit or was discharged by Unisea. See Ex. 1 to Ohring Decl. (docket no. 29-1 at 3); Ex. 3 to Plaisance Decl. (docket no. 19 at 11). Additionally, Unisea's contention that Ohring could have easily found another job during the COVID-19 pandemic, which would fit his needs and skills, is speculative. The context in which Unisea presented the delegation clause to Ohring "placed undue pressure on [him] to sign the agreement without providing [him] with a reasonable opportunity to consider its terms," and the Court concludes that the delegation clause is procedurally unconscionable. See Zuver v. Airtouch Commc'n, Inc., 153 Wn.2d 293, 307, 103 P.3d 753 (2004).

Unisea next asserts that Ohring's decision to sign a second Employment Agreement demonstrates that the delegation clause was not procedurally unconscionable. Specifically, Unisea contends that because four months had passed between Ohring signing the first and second Employment Agreements, he had time to decide whether he wanted to recommit to arbitration and thus had a meaningful choice when signing the second Employment Agreement. But Ohring signed the delegation clause just one time as the delegation clause is contained in the DRA, not the Employment Agreements.

Thus, it is unclear how Ohring having four months to ask questions about the delegation clause after he had already signed it constitutes evidence that he had a meaningful choice to assent to the clause in the first instance. Cf. Romney v. Franciscan Med. Grp., 186 Wn. App. 728, 740, 349 P.3d 32 (2015) (upholding an arbitration agreement in part because employees had signed multiple employment agreements containing the arbitration provision at issue).

Unisea also argues that the only reason it required employees to assent to the delegation clause after arriving to Dutch Harbor was because of complications caused by the COVID-19 pandemic. While this might be true, it does not change the inevitable conclusion that the circumstances in which Ohring agreed to the delegation clause were procedurally unconscionable. Because the Court concludes that the delegation clause is procedurally unconscionable, which is sufficient to void an agreement under Washington law, the Court does not address whether the delegation clause is also substantively unconscionable. See Burnett, 196 Wn.2d at 54. Accordingly, the Court will consider whether the arbitration provisions in the DRA and other agreements are unconscionable.

### 3.    Unconscionability of Arbitration Provisions

Ohring asserts that the arbitration provisions in the DRA and other agreements are procedurally and substantively unconscionable. The existence of an unconscionable bargain is a question of law. Nelson v. McGoldrick, 127 Wn.2d 124, 131, 896 P.2d 1258 (1995).

### a.    Procedural Unconscionability

Regarding procedural unconscionability, Ohring makes the same arguments that

1  he made with respect to the DRA's delegation clause. Ohring signed the arbitration

2  provisions in the first Employment Agreement and the Acknowledgment of Receipt at the

3  same time he signed the DRA containing the delegation clause. Thus, for the reasons

4  already explained, the Court determines that the DRA as a whole, and the arbitration

5  provisions contained in the other agreements, are procedurally unconscionable and void.[2]

6          **b.      Substantive Unconscionability**

7          Ohring further argues that the DRA is substantively unconscionable. A contract

8  provision is substantively unconscionable when it is one-sided. <u>Burnett</u>, 196 Wn.2d at

9  57. "In determining if a contractual provision is one-sided or overly harsh, courts have

10  considered whether the provision is shocking to the conscience, monstrously harsh, and

11  exceedingly calloused." <u>Id.</u>

12          Ohring asserts the DRA is substantively unconscionable because of the one-sided,

13  multistep pre-arbitration process, the shortened statute of limitations, the one-sided

14  termination right, the "Costs of Arbitration" clause, and the confidentiality provision.

15  The Court addresses each argument in turn.

16  //

17  //

18  //

19

20  [2] Unisea also argues that because the second Employment Agreement was signed under different
circumstances, that agreement's arbitration clause is not procedurally unconscionable. Because, as
21  explained below, the Court concludes that the DRA, which serves as the basis for and is incorporated by
the Employment Agreements' arbitration provisions, is substantively unconscionable, it is
22  inconsequential that Ohring may have signed the second Employment Agreement on more equal footing.

23

**ORDER** - 13

### i.      Multistep Pre-arbitration Process

Ohring challenges the multistep pre-arbitration process as one-sided, contending its effect is to require only employees, and not Unisea, to arbitrate Covered Disputes. The DRA outlines a two-step, pre-arbitration process:

**All Covered Disputes must be resolved using the steps below:**

**1)**    The Covered Dispute must first be discussed with Employee's immediate supervisor, department manager, human resources representative, or company executive, at the option of the employee.

**2)**    If the discussion required in Step 1 does not resolve the Covered Dispute, Employee must discuss the Covered Dispute with the Corporate Human Resources Manager or his or her designee. Employee must attempt to resolve Covered Disputes through Steps 1 and 2 before moving to Step 3.

**3)**    **Arbitration.**  Any Covered Dispute that has not been resolved at Steps 1 or 2 must be resolved by binding arbitration. Both Employee and Employer give up the right to have Covered Disputes decided in court and voluntarily waive the right to a jury trial.

DRA (docket no. 19 at 78).

Ohring likens the pre-arbitration process in the DRA to one the Washington Supreme Court found unconscionable in <u>Burnett</u>. In <u>Burnett</u>, however, the clause was substantively unconscionable because the effect of the pre-arbitration process was to require only employees to arbitrate their claims, and the employer could arbitrate at its discretion. 196 Wn.2d at 59–60. By contrast here, the third step of the DRA's process, requires Unisea to "give up the right to have Covered Disputes decided in court." DRA at 78. The pre-arbitration process here is distinguishable because, while only the employee must go through steps one and two before submitting a claim to arbitration,

both the employee and employer agreed to arbitrate Covered Disputes. For this reason, the Court determines that the provision requiring the employee to follow a multistep pre-arbitration process does not render the arbitration agreement one-sided.

### ii. Shortened Statute of Limitations

Ohring next contends that the DRA is substantively unconscionable because it shortens the statute of limitations period only for claims brought by employees. The DRA requires employees to serve a demand for arbitration within 12 months of the date on which they knew or should have known of the incident giving rise to the Covered Dispute. DRA at 79. If employees do not serve the demand within the specified time, they are "deemed to have conclusively waived any claims arising out of the incident." Id. The DRA also does not toll the limitations period while the employee goes through the multistep pre-arbitration process. See id.

The FLSA sets a statute of limitations of three years for willful violations and two years for all other violations. 29 U.S.C. § 255(a). The Alaska statute has a two-year statute of limitations. AS § 23.10.130. While parties may typically shorten the applicable statute of limitations by contract, such a limitation may be harsh and one-sided when imposed in a contract of adhesion. See McKee v. AT&T Corp., 164 Wn.2d 372, 399, 191 P.3d 845 (2008).

The Washington Supreme Court has found a statute of limitations provision in a contract unconscionable where it cut the otherwise applicable limitations period in half. See id. Similarly, the contractual limitations period at issue here shortens the statutory limitations periods from two or three years to one year. The provision's shortened

limitations period, in combination with the DRA's lack of a tolling provision, the fact that the time for completing this process is completely within Unisea's control, and it being presented in a contract of adhesion, makes the provision substantively unconscionable. See id.; Burnett, 196 Wn.2d at 58; Gandee v. LDL Freedom Enter., Inc., 176 Wn.2d 598, 606–07, 293 P.3d 1197 (2013).

### iii. Termination Right

Ohring further argues that the termination clause is substantively unconscionable because it permits only Unisea to terminate the DRA. The DRA's termination clause reads as follows, "Employer may terminate this Agreement by providing Employee with not less than sixty (60) days' notice in advance of the designated termination date. Any Covered Dispute arising out of an incident which occurred prior to the termination of this Agreement shall still be subject to this Agreement, providing the demand for arbitration is timely filed." DRA (docket no. 19 at 80). The Ninth Circuit has concluded that, under Washington law, a contract giving only the employer the ability to unilaterally terminate an arbitration agreement was substantively unconscionable. Al-Safin v. Cir. City Stores, Inc., 394 F.3d 1254, 1261–62 (9th Cir. 2005).[3] Unisea does not point to any differences

_____

[3] Unisea argues that Al-Safin has been rendered obsolete, but this is incorrect. Prior to Al-Safin, the Ninth Circuit had analyzed whether the same arbitration agreement was unconscionable under California law. See Ingle v. Cir. City Stores, Inc., 328 F.3d 1165, 1179 (9th Cir. 2003). Because at the time the Ninth Circuit decided Al-Safin, California and Washington unconscionability law was the same, the Ninth Circuit relied on Ingle when holding that the arbitration agreement was also unconscionable under Washington law. See Al-Safin, 394 F.3d at 1261–62. Unisea argues that because California law has since developed to permit unilateral modification terms based on the implied covenant of good faith and fair dealing, Ingle is no longer good law and therefore neither is Al-Safin. Reply at 11 (citing California cases). Unisea, however, fails to point to any published authority showing that Washington law has developed in the same manner as California law. Moreover, one unpublished case cited by Unisea notes that unilateral modification provisions "may be legally suspect under Washington law" and that such

in its termination clause from the one at issue in <u>Al-Safin</u> that would suggest its holding does not apply in this case. Accordingly, the Court concludes that the DRA's termination clause in substantively unconscionable.

### iv. Costs of Arbitration

Ohring next challenges the Costs of Arbitration provision, which provides:

> **Costs of Arbitration.** Unless otherwise ordered by the arbitrator, the cost of the arbitration and the arbitrator's expenses shall be shared equally by the parties. Unless otherwise ordered by the arbitrator, all other costs incurred as a result of the arbitration, such as attorney's fees, witness expenses, copying costs, court reporters' fees, shall be paid by the party incurring them.

DRA at 84.

Ohring asserts that this provision places him at an unfair disadvantage by undermining his right to attorney's fees under FLSA and the Alaska statute and points to a Washington Supreme Court decision holding that an attorney's fees provision was substantively unconscionable. <u>See</u> <u>Adler v. Fred Lind Manor</u>, 153 Wn.2d 331, 354–55, 103 P.3d 773 (2004). There, although the agreement generally provided that Washington law governed, the attorney's fee provision was more specific in stating that the parties shall bear their own attorney fees. <u>Id.</u> Accordingly, because the more specific provision governs, the attorney's fee provision deprived the plaintiff of their statutory right to attorney's fees under Washington law. <u>Id.</u>

---

provisions are "particularly suspect when the original agreement was a contract of adhesion." <u>Stone v. Mid. Am. Bank & Tr. Co.</u>, No. 2:18-cv-87-RMP, 2018 WL 4701843, at *7 (E.D. Wash. Aug. 31, 2018).

By contrast here, the DRA's use of the word "shall" is twice qualified by the phrase "[u]nless otherwise ordered by the arbitrator." Thus, the clause does not deprive Ohring of any statutory rights to attorney fees because, should he prevail, the arbitrator would have the authority to award attorney's fees. In Washington, courts follow the American rule and each party is expected to pay their own attorney fees, unless otherwise provided by statute or contract. See McKee, 164 Wn.2d at 400. The provision at issue here is merely an embodiment of that rule. The Costs of Arbitration clause is not substantively unconscionable.

### v.  Confidentiality

Lastly, Ohring challenges the confidentiality provision as contrary to the Washington Constitution. The Confidentiality provision reads as follows:

> **Confidentiality.** All matters submitted to arbitration, as well as the decision of the arbitrator, testimony, discovery, facts and matters presented in arbitration, shall be confidential and shall not be disclosed by any party or participant in the arbitration, except as is necessary for the enforcement or appeal of the decision of the arbitrator.

DRA (docket no. 19 at 80).

"Washington has a strong policy that justice should be administered openly and publicly." McKee, 164 Wn.2d at 398. Pursuant to this policy, the Washington Supreme Court has noted that "[a] confidentiality clause in a contract of adhesion is a one-sided provision designed to disadvantage claimants." Id. Indeed, the DRA's confidentiality clause unreasonably favors Unisea because, as a "repeat player[]," the clause ensures that Unisea will accumulate knowledge about the arbitrators, legal issues, and tactics while its

employees are prevented from sharing information, no matter how similar their claims. See id.

Unisea argues that confidentiality provisions are not unconscionable per se. See Reply at 9, n.6 (citing Morris v. Confier Health Sol., LLC, No. 20-cv-5181-RJB, 2020 WL 1631203 (W.D. Wash. Apr. 2, 2020)). But in that case, the confidentiality provision was flexible and permitted exceptions on a "need to know" basis, i.e., as permitted or as required by law. See Morris, 2020 WL 1631203, at *5. The clause at issue here does not contain similar exceptions and permits disclosure for only the appeal or enforcement of the decision. Because the confidentiality clause "serves no purpose other than to tilt the scales in favor of" Unisea, the Court concludes that it is substantively unconscionable. See McKee, 164 Wn.2d at 398.

### vi.        Waiver

Unisea argues that even if some of the DRA's provisions are substantively unconscionable, the issue is moot because it has voluntarily waived those provisions. To support its argument, Unisea cites two general contract cases for the proposition that a party can waive a contract provision that is meant for its benefit. Reply at 7 (citing Mike M. Johnson, Inc. v. County of Spokane, 150 Wn.2d 375, 78 P.3d 161 (2003) and Reynolds Metals Co. v. Elec. Smith Const. & Equip. Co., 4 Wn. App. 695, 483 P.2d 880 (1971)). But courts generally interpret contracts as of the time of contracting, which makes any subsequent offer to waive unconscionable terms irrelevant. See Gandee, 176 Wn.2d at 607. With respect to arbitration agreements in particular, "[s]trong reasons exist for encouraging contracts to be conscionable at the time they are written and

allowing after-the-fact waiver to moot unconscionability challenges is the exception, not the rule." Id. at 608.

Here, policy considerations dictate that the Court should not accept Unisea's after-the-fact waiver of the unconscionable terms. Unisea did not waive the shortened limitations period and confidentiality provision until *after* Ohring had filed his lawsuit.[4] To permit Unisea "to load [its] arbitration agreements full of unconscionable terms" and then waive them shortly before seeking to enforce them in court "would encourage rather than discourage one-sided agreements and would lead to increased litigation. Any other approach is inconsistent with the principle that contracts—especially adhesion contracts common today—should be conscionable and fairly drafted." Id. at 608–09. The Court concludes that Unisea's waiver of the unconscionable terms does not moot Ohring's substantive unconscionability arguments.

### vii.    Severance

Finally, Unisea argues that even if the DRA's terms are unconscionable and cannot be waived, then the unconscionable terms can be severed from the contract.

When a court determines that a contract provision is substantively unconscionable, the typical remedy is severance. Gandee, 176 Wn.2d at 603. Especially, where, as here, the contract contains a severance clause, "courts are 'loath to upset the terms of an agreement.'" Gandee, 176 Wn.2d at 607 (quoting Zuver, 153 Wn.2d at 320). When

---

[4] Similarly, although the Court did not find the multistep pre-arbitration process unconscionable, Unisea only waived that provision two days before it filed its motion to compel arbitration.

unconscionable provisions permeate the agreement, however, courts will strike the entire section or contract.  Id. at 603; McKee, 164 Wn.2d at 402.  "Stated differently, when severance will 'significantly alter both the tone of the arbitration clause and the nature of the arbitration contemplated by the clause,' the appropriate remedy is to invalidate the entire agreement."  Woodward v. Emeritus Corp., 192 Wn. App. 584, 602, 368 P.3d 487 (2016).

The Washington Supreme Court has severed unconscionable provisions and enforced the remainder of arbitration agreements where it held that two discrete provisions were unconscionable.  See Zuver, 153 Wn.2d at 320; Adler, 153 Wn.2d at 359–60.  But where the arbitration agreement contained three or four unconscionable provisions, that court has struck the entire arbitration provision or contract.  See Gandee, 176 Wn.2d at 607; McKee, 164 Wn.2d at 403.  The Washington Supreme Court has also acknowledged "that in instances where an employer engages in an 'insidious pattern' of seeking to tip the scales in its favor in employment disputes by inserting numerous unconscionable provisions in an arbitration agreement, courts may decline to sever the unconscionable provisions."  Adler, 153 Wn.2d at 359 (quoting Ingle, 328 F.3d at 1180).

Here, the DRA contained three unconscionable provisions relating to the timing of the arbitration, Unisea's unilateral ability to terminate the agreement, and the confidentiality of the arbitration.  Furthermore, Unisea has waived the multistep pre-arbitration process, which the Court did not find to be substantively unconscionable, and the cost-sharing provision, which Ohring did not challenge.  Thus, as the Court would need to sever five provisions from the DRA, the terms permeate the agreement.  For this

reason, and because Unisea engaged in a pattern of trying to tip the scale in its favor in employment disputes,[5] the Court declines to sever the provisions and instead invalidates the entire DRA as substantively unconscionable. This outcome is also consistent with policy considerations identified by the Washington Supreme Court. Specifically, permitting severance when a contract "is permeated with unconscionability only encourages those who draft contracts of adhesion to overreach. If the worst that can happen is the offensive provisions are severed and the balance enforced, the dominant party has nothing to lose by inserting one-sided, unconscionable provisions." McKee, 164 Wn.2d at 403.

In conclusion, the Court determines that the parties did not have a valid agreement to arbitrate and denies Unisea's motion to compel arbitration. Accordingly, the Court need not address whether the parties agreed to classwide arbitration and denies Unisea's request for leave to file a separate motion for attorney's fees. See Mot. to Compel Arbitration at 9–11.

//

//

//

---

[5] Unisea acknowledges that the four DRA provisions it offered to waive after Ohring initiated this litigation were meant for its benefit alone. See Reply at 7.

## Conclusion

For the foregoing reasons, the Court ORDERS:

(1)     Unisea's Motion to Compel Arbitration, docket no. 18, is DENIED.

(2)     The Clerk is directed to send a copy of this Order to all counsel of record.

IT IS SO ORDERED.

Dated this 13th day of July, 2021.

_____
Thomas S. Zilly
United States District Judge